JS-6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 672 | **DATE** | 5/12/2004 |
| **CASE TITLE** | Atanas A. Genov vs. John Ashcroft | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____ .
(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____ .
(4) ☐ Ruling/Hearing on _____ set for _____ at _____ .
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .
(7) ☐ Trial[set for/re-set for] on _____ at _____ .
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____ .
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. Genov's Amended Petition for Issuance of Writ of Habeas Corpus and for Mandamus, Declaratory and Injunctive Relief is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | MAY 1 3 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | GMA | 13 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 5/12/2004 | |
| | | | date mailed notice | |
| | ETV | courtroom deputy's initials | ETV | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| ATANAS A. GENOV, | ) | |
| Petitioner, | ) ) ) | DOCKETED |
| v. | ) ) | MAY 1 3 2004 |
| | ) No. 03 C 672 | |
| JOHN ASHCROFT, Attorney General of the United States, THOMAS RIDGE, Secretary of Homeland Security, District Director, Bureau of Citizenship and Immigration Services, successor agency to U.S. Immigration and Naturalization Service, Board of Immigration Appeals, | ) ) ) ) ) ) ) ) ) ) ) | Judge Rebecca R. Pallmeyer |
| Respondents. | ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner Atanas A. Genov has filed a petition for writ of habeas corpus, mandamus, and declaratory and injunctive relief to prevent his deportation to Bulgaria. Genov alleges that he was denied effective assistance of counsel in violation of his Fifth Amendment due process rights, and that neither the Immigration and Naturalization Service ("INS") nor the new Department of Homeland Security ("DHS") had authority to deny his request for administrative stay of deportation. For the reasons set forth here, Genov's petition is denied.

## BACKGROUND

Genov, a Bulgarian national, first entered the United States on a visitor's visa on April 16, 1990. (Petition, at 2.)[1] Shortly thereafter on May 14, 1990, he filed a request for political asylum. (Ex. N to Petition.) In June 1993, Genov moved in with Rumiana Nikolova ("Rumiana"), also a Bulgarian national, in Lombard, Illinois. At the time, Rumiana was married to Rumen Panaiotov, who was residing in Bulgaria. Rumiana had applied for asylum in the United States in April 1993

---

[1] Genov's Amended Petition for Issuance of Writ of Habeas Corpus and for Mandamus, Declaratory and Injunctive Relief is cited as "Petition, at ___."

13

and had asked her husband, whom she described as violent and well-connected in Bulgaria, for a divorce. (Rumiana Aff., Ex. D to Petition ¶¶ 1, 2.) Panaiotov refused but later obtained a divorce himself in June 1994. Rumiana learned of that divorce two years later, after she was granted asylum in the United States on February 23, 1996. (Petition, at 2-3, 10.)

On February 12, 1997, Genov's request for political asylum was denied and the INS issued an Order to Show Cause. (Ex. N to Petition.) Genov retained Attorney David Butbul to represent him before the Immigration Court. On Butbul's advice, Genov filed an asylum application and an application for suspension of deportation under § 203(a) of the Nicaraguan Adjustment and Central American Relief Act ("NACARA"), Pub. L. No. 105-100, 111 Stat. 2160, 2196-98. (Petition, at 9.)[2] Section 203 of NACARA amended § 240A of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. 104-208, 110 Stat. 3009, 3009-627, which in turn amended § 244(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1254(a). Under NACARA § 203(a), any alien who entered the United States on or before December 31, 1990, who filed an application for asylum on or before December 31, 1991, and whose country of origin was a signatory to the Warsaw Pact, including Bulgaria, may apply for suspension of deportation under former § 244 of the INA. Section 244 sets forth the following requirements for an alien to avoid deportation: (1) physical presence in the United States for a continuous period of seven years prior to filing for relief; (2) good moral character during that period; and (3) evidence that deportation would result in "extreme hardship to the alien, or to [the alien's] spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence." 8 U.S.C. § 254(a) (1994). See *Useinovic v. I.N.S.*, 313 F.3d 1025, 1034 (7th Cir. 2002); *Buzdygan v. I.N.S.*, 259 F.3d 891, 892 (7th Cir. 2001).

---

[2] The date of this application is not in the record.

Throughout the immigration proceedings, Butbul knew that Genov was living with Rumiana and that they had a stable relationship. (The court is uncertain whether he was also aware that Rumiana was no longer married.) Butbul nevertheless advised Genov that marrying Rumiana would not affirmatively benefit his application for suspension of deportation under NACARA. (Petition, at 10.) Genov now believes, however, that "Rumiana could have established the requirement of extreme hardship to [Genov], by reason of her fear of returning to Bulgaria and the precarious state of her health." (*Id.*) In any event, on February 27, 1998, Rumiana appeared before Immigration Judge Craig M. Zerbe and testified that she was Genov's fiancee. When Butbul asked her why she and Genov were not yet married, Rumiana explained that they "didn't want the others to think that we get married just for the sake of the green card," and that Genov wanted children but she was having difficulties getting pregnant. (Ex. E to Petition, at 63-64.) The same day, Genov similarly testified that he and Rumiana had discussed getting married but that early in their relationship, she was waiting for divorce papers, and that "later, I don't know, I just have some feeling that she's delaying this a little bit probably because she has some fertility problems and maybe she wants to make sure first that she will be able to have a child." (Ex. F to Petition, at 22-24.) After hearing the testimony, Judge Zerbe issued an oral ruling denying Genov's application for suspension of deportation. (Ex. G to Petition.) As part of his ruling, Judge Zerbe acknowledged that Genov had an "important relationship" with Rumiana but noted that the relationship could not impact his decision on "extreme hardship" to any substantial degree because it was not a legal relationship. (*Id.* at 9.)

On August 13, 1998, Genov and Rumiana were married. (Ex. A to Petition.) Rumiana was granted permanent resident alien status in October 1999, and on April 30, 2001, she filed an Immigrant Petition for Relative (I-130) on behalf of Genov, which remains pending. (Exs. B and C to Petition.) On June 5, 2002, the Board of Immigration Appeals ("BIA") summarily affirmed Judge Zerbe's decision to deny Genov's application for suspension of deportation and gave Genov

30 days to voluntarily leave the United States. (Ex. H to Petition.) Butbul failed to notify Genov that he could seek judicial review of that order with the Seventh Circuit, nor did Butbul explain that an order of deportation would issue if Genov failed to leave the country or to obtain an extension of voluntary departure. (Petition, at 12.)

Instead, on September 4, 2002, Butbul filed a motion to reopen the immigration proceedings, noting that Genov's now wife, Rumiana, had filed an Immigrant Petition for Relative on his behalf, and arguing that since the time Genov had applied for asylum, "drastic changes [had] occurred in the home country of the Respondent [Genov] with reference to people with [the] same nationality [Macedonian] as the Respondent." (Ex. I to Petition ¶¶ 4, 5.) Butbul asked the BIA to reopen and remand the case to the Office of the Immigration Court to "review the possibility of adjustment of [Genov's] status to that of a permanent resident." (*Id.* at 2.) Genov claims this request was "false" because the I-130 petition, if granted, merely qualified Genov for classification as the spouse of a permanent resident alien. As such, he would still be subject to the numerical limitations imposed on immigrant visas, and at that time, Genov says, a visa number was not immediately available to him due to a backlog in applications. (Petition, at 12-13.) See also *Tak Cheong Hau v. Moyer*, 576 F. Supp. 844, 846 (N.D. Ill. 1983) (I-130 petition "would merely qualify [petitioner], if it were granted, for classification under the second preference category as the spouse of a permanent resident alien").

On November 7, 2002, the BIA denied the motion to reopen. The BIA first noted that though Genov claimed to be married, he failed to provide any documentary evidence regarding his wife, his marriage, or his visa petition. (Ex. J to Petition, at 1.) As for Genov's claimed fears about returning to Bulgaria as a person of Macedonian ancestry, the BIA stated that Genov failed to provide an affidavit confirming that ancestry or "describing why he now fears return to Bulgaria." (*Id.*) In addition, the documentary evidence attached to the motion "indicate[d] that Macedonians are not a recognized ethnic group in Bulgaria, [i.e., they] are [not] politically active, and [do not] face

4

discrimination and harassment in Bulgaria." (*Id.* at 2.) Genov did not receive notice of the BIA's decision until Butbul forwarded it in a December 12, 2002 letter. (Ex. K to Petition.) By that date, Genov's 30 day period for appealing the decision to the Seventh Circuit had expired. (Petition, at 13.) On or about December 18, 2002, the INS issued a notice requiring Genov to appear for deportation to Bulgaria on January 30, 2003. (Ex. M to Petition.)

After retaining new counsel, Mary L. Sfasciotti, Genov filed a Petition for Issuance of Writ of Habeas Corpus with this court on January 19, 2003. Shortly thereafter on January 28, 2003, Genov filed with the BIA a Motion to Reopen Removal Hearing to Present Additional Evidence Bearing on Respondent's Eligibility for Suspension of Deportation that was not Presented to the Immigration Judge by Reason of Ineffective Assistance of his Former Counsel. (Ex. O to Petition.) In that motion to reopen, Genov argued that Butbul provided ineffective representation by (1) failing to advise him that marrying Rumiana could support his application for suspension of deportation; (2) failing to timely notify the BIA of Genov's marriage to Rumiana in August 1998; (3) filing a meritless motion to reopen without appropriate affidavits and documentary evidence; and (4) failing to timely notify Genov of the BIA's decision denying his application for suspension of deportation. (*Id.* ¶¶ 3-11.) Genov noted that he had filed a complaint against Butbul with the Attorney Registration and Disciplinary Commission, and asked that his September 4, 2002 motion to reopen not be counted towards the numerical limit on such motions. (*Id.* ¶¶ 12, 13.) *See Chowdhury v. Ashcroft*, 241 F.3d 848 (7th Cir. 2001) (quoting 8 C.F.R. § 3.2(c)(2)) ("a party may file only one motion to reopen deportation or exclusion proceedings").

Also on January 28, 2003, Genov filed with the INS a request for an administrative stay of deportation until at least June 1, 2003. (Ex. L to Petition.) Genov explained that he owned a business that needed to be liquidated and a home that needed to be sold, and noted that he had filed a Motion to Reopen and a Writ of Habeas Corpus. (*Id.*) On January 30, 2003, Genov appeared at the INS offices as instructed in the December 18, 2002 notice, but he was not taken

into custody at that time. (Petition, at 14-15; Ex. M to Petition.) On or about March 10, 2003, however, Cynthia J. O'Connell, Interim District Director, Interior Enforcement, Bureau of Immigration & Customs Enforcement, denied Genov's application for stay of deportation. (Ex. N to Petition.) O'Connell stated that Genov's removal proceedings had been pending for six years, which provided him "ample time to dispose of his personal property." (*Id.* at 2.) O'Connell further stated that the mere filing of a motion to reopen and a writ of habeas corpus "does not warrant a stay of removal." (*Id.*)

On March 21, 2003, Genov filed an Amended Petition for Issuance of Writ of Habeas Corpus and for Mandamus, Declaratory and Injunctive Relief, which is currently before this court. In his amended petition ("Petition"), Genov asserts jurisdiction based not only on 28 U.S.C. § 2241, but also on the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; 8 U.S.C. §§ 1252, 1362, and 1252(f); and the All Writs Act, 28 U.S.C. § 1651. In Count I of his petition, Genov seeks a declaration that his order of deportation is "null and void" in violation of his Fifth Amendment due process rights because he did not receive effective assistance of counsel. (Petition, at 14.) He also seeks a declaration that the District Director of the INS, Cynthia O'Connell, "had no authority to determine requests for administrative stays of deportation since INS had been abolished effective March 1, 2003 by the Homeland Security Act." (*Id.* at 15.) Genov concedes that all tasks previously performed by the INS were supposed to become the responsibility of the Department of Homeland Security as of March 1, 2003. In Genov's view, however, because Congress did not effectively transfer power from the Attorney General to the Secretary of Homeland Security to enforce and administer immigration laws regarding deportation and other discretionary matters, O'Connell's act was void. (Supp., at 15-23.)[3] In Count II of his petition, Genov asks the court for a mandamus ordering the BIA to "expeditiously decide his motion to reopen." (Petition, at 16.)

---

[3] Genov's Supplemental Memorandum of Law in Support of Amended Petition for Review is cited as "Supp., at ___."

Count III seeks to enjoin Respondents from enforcing the outstanding deportation order. (*Id.* at 16-17.)

## DISCUSSION

Respondents Attorney General John Ashcroft and Secretary of Homeland Security Tom Ridge object that this court lacks jurisdiction to consider Genov's Petition. Specifically, Respondents claim that Genov's requests for habeas and declaratory relief are both, at base, challenges to the removal order entered by the immigration judge and affirmed by the BIA, and that such orders must be appealed directly to the Seventh Circuit. (Return, at 2.)[4] Respondents also claim that Genov's request for a mandamus ordering the BIA to expeditiously decide his motion to reopen is moot. (*Id.*)

### I.     Default Judgment

Before turning to Respondents' arguments, the court first considers Genov's assertion that he is entitled to a default judgment. Genov claims that Respondents failed to file a proper "return" to the writ of habeas corpus because their Return "is not certified as to the true cause of detention" as required by 28 U.S.C. § 2243. (Response, at 4.) *See* 28 U.S.C. § 2243 ("[t]he person to whom the writ or order is directed shall make a return certifying the true cause of the detention"). Genov also claims that the Return is "not supported by documents culled from the Petitioner's administrative file." (Response, at 4.) In Genov's view, the Return should be treated as a motion to dismiss because it challenges the court's subject matter jurisdiction pursuant to FED. R. CIV. P. 12. According to Genov, however, the Return does not satisfy the requirements of such a motion and must be stricken. (*Id.*) (citing *Allen v. Perini*, 424 F.2d 134, 138 (6th Cir. 1970)) ("the return to a petition for habeas corpus is not an answer within the meaning of Rule 12").

---

[4]     Respondents' Return to the Petitioner's Amended Petition for Writ of Habeas Corpus, Mandamus and Declaratory and Injunctive Relief is cited as "Return, at ___."

7

The court does not agree that *Allen* provides a basis for entering a Rule 55 default judgment in this case. Indeed, the *Allen* court expressly stated that "Rule 55(a) has no place in habeas corpus cases." 424 F.2d at 138. In any event, the fact that a return is not an answer does not mean that a return may not constitute a motion to dismiss. In this court's view, Respondents' Return, which raises strictly jurisdictional challenges, is properly characterized as a motion to dismiss pursuant to Rule 12(b)(1). This court concludes further that contrary to Genov's assertion, the motion is timely and Respondent is not in default. Genov filed his amended petition on March 21, 2003 and a Supplemental Memorandum of Law in Support of Amended Petition for Review on April 29, 2003. On June 2, 2003, the court granted Respondents' agreed motion for an extension of time to June 30, 2003 to answer or otherwise plead to the Petition. Respondents timely filed their Return on June 30, 2003. In this circuit, default judgment is an extreme sanction that is disfavored in habeas corpus cases. *Bleitner v. Welborn*, 15 F.3d 652, 653 (7th Cir. 1994). Genov's request for a default judgment is denied.

Nor must the court accept as true Genov's allegation that "the transfer of power to the Secretary to detain and remove aliens is ineffective." (Response, at 5-6.) In deciding a motion to dismiss for lack of subject matter jurisdiction, the court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the petitioner. *See Ramos v. Ashcroft*, No. 02 C 8266, 2003 WL 22282521, at *2 (N.D. Ill. Sept. 30, 2003) (citing *Transit Exp., Inc. v. Ettinger*, 246 F.3d 1018, 1023 (7th Cir. 2001)) (employing Rule 12(b)(6) standard for Rule 12(b)(1) motion). The court is not, however, "obliged to accept as true legal conclusions." *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002). Genov's motion for a temporary restraining order preventing him from "being taken into custody, detained, and deported" during the pendency of this case, (Response, at 6), is denied. The court will consider Genov's "transfer of power" allegations as argument rather than a factual assertion, and will address them in the discussion below.

8

## II. Subject Matter Jurisdiction

Respondents argue that this court lacks jurisdiction to review Genov's petition for habeas corpus and declaratory relief because final removal orders from the BIA must be appealed directly to the Seventh Circuit pursuant to 8 U.S.C. § 1252(g). Section 1252(g) provides:

> Exclusive jurisdiction: Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this act.

In *Sharif ex rel. Sharif v. Ashcroft*, 280 F.3d 786 (7th Cir. 2002), the Seventh Circuit held that § 1252(g) "blocks review in the district court of particular kinds of administrative decisions"; namely, the Attorney General's discretionary decisions to commence proceedings, adjudicate cases, or execute removal orders. *Id.* at 787 (citing *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999)) (holding same). *See also I.N.S. v. St. Cyr*, 533 U.S. 289, 311 n.34 (2001). *But see Riley v. I.N.S.*, 310 F.3d 1253, 1256 (10th Cir. 2002) ("[w]e join the reasoning of the Second and Third Circuits and hold that . . . [t]he INS did not strip § 2241 federal habeas jurisdiction in . . . 8 U.S.C. § 1252(g)").

In Respondents' view, Genov's challenge to the decision denying his motion to reopen deportation proceedings and to stay the execution of his deportation implicates just such a discretionary decision. The BIA denied that motion on May 16, 2003, (Ex. 1 to Return), and "to the limited extent that judicial review of BIA determinations is available, it must be sought not in the district court, but rather in [the Court of Appeals]." *Bhatt v. Board of Immigration Appeals*, 328 F.3d 912, 914 (7th Cir. 2003). *See also Sharif*, 280 F.3d at 787-88 ("a district court lacks jurisdiction to compel the Attorney General to initiate or resolve proceedings that would lead to relief from removal"). Indeed, on June 16, 2003, Genov filed a Petition for Review of the BIA's decision with the Seventh Circuit. (Ex. A to Response.)

Genov responds that the jurisdictional bar does not apply to his legal challenges to (1) Respondent Ridge's authority to enforce deportation orders and adjudicate administrative stays of deportation; or (2) the validity of the removal order in light of Genov's claim of ineffective assistance of counsel. (Supp., at 12-13; Response, at 6-7.) Genov also notes that there is an exception, or "safety-valve," to the preclusion of judicial review under § 1252(g) in "rare cases that present substantial constitutional issues or bizarre miscarriages of justice." *Chapinski v. Ziglar*, 278 F.3d 718, 721 (7th Cir. 2002). Genov suggests that he has raised such a substantial constitutional issue by challenging his deportation order "as a violation of due process by reason of ineffective assistance of counsel." (Supp., at 12-13.)

The court agrees that Genov's challenge to the authority of the DHS to execute his removal order and adjudicate requests for stays of removal presents a legal question that may be considered by this court. As noted, § 1252(g) only deprives district courts of jurisdiction to review the Attorney General's discretionary decisions to commence proceedings, adjudicate cases, or execute removal orders. *Sharif*, 280 F.3d at 787. A challenge to the Attorney General's authority to act under a statute is not the same as a request for review of the Attorney General's discretionary decisions. *See Zadvydas v. Davis*, 533 U.S. 678, 688 (2001). Accordingly, this court has jurisdiction to consider whether the DHS had authority to administer and enforce statutory provisions relating to entry, admission, and removal of aliens notwithstanding the jurisdictional bar in § 1252(g).

The same is not true of Genov's legal challenge to the removal order based on ineffective assistance of counsel. In support of this argument, Genov relies on *Riley v. I.N.S.*, 310 F.3d 1253 (10th Cir. 2002), and *Chmakov v. Blackman*, 266 F.3d 210 (3d Cir. 2001), both of which held that district courts have jurisdiction to consider habeas petitions challenging final deportation orders on the grounds of ineffective assistance of counsel. *Riley*, 310 F.3d at 1255-56; *Chmakov*, 266 F.3d at 215-16. *See also Liu v. I.N.S.*, 293 F.3d 36, 37 (2d Cir. 2002) (district court had jurisdiction to

10

consider petitioner's claim that she was denied due process and equal protection in immigration proceedings because she was not afforded the non-adversarial interview required by 8 C.F.R. § 298.9). The Seventh Circuit has not followed suit, however, finding in *Sharif* that a federal district court did not have authority to hear a habeas petition brought by two sisters seeking a stay of deportation and also to prevent the INS from executing an order of removal against them. 280 F.3d at 787 ("[a] request for a stay of removal 'arises from' the Attorney General's decision (reflected by the bag-and-baggage letter) to execute a removal order"). Recognizing that he faces an uphill battle in asking this court for a stay of deportation in a habeas proceeding, Genov characterizes his petition as a challenge to the legality of the order of removal based on ineffective assistance of counsel. "The fact remains, however, that he is seeking a stay of deportation; a remedy that *Sharif* seems to foreclose." *Beshay v. U.S.*, No. 03-C-206-C, 2003 WL 23142258, at *2 (W.D. Wis. May 2, 2003).

Also unavailing is Genov's suggestion that ineffective assistance of counsel is the type of rare "substantial constitutional issue" or "bizarre miscarriage of justice" that merits a recognized exception under § 1252. Indeed, the Seventh Circuit recently rejected that argument in *Dave v. Ashcroft*, 363 F.3d 649, 2004 WL 787242 (7th Cir. 2004). The petitioner in *Dave* sought review of three adverse decisions of the BIA. The Department of Homeland Security moved to dismiss for lack of jurisdiction under 8 U.S.C. § 1252(a)(2)(C), which precludes courts from reviewing "any final order of removal against an alien who is removable by reason of having committed a criminal offense" involving a firearm. *Id.* at *2. The petitioner claimed that notwithstanding the jurisdictional bar, the court could consider his petitions because he had raised "substantial" constitutional issues. One of those issues was a claim that he was denied effective assistance of counsel, "a right that – at least in immigration proceedings – exists (if at all) under the due process clause." *Id.* at *3 (citing *Pop v. I.N.S.*, 279 F.3d 457, 460 (7th Cir. 2002)) ("[i]n this circuit, . . . whether there exists a constitutional right to effective assistance of counsel in immigration cases is virtually foreclosed").

11

The court found that such a denial of due process did not present a substantial constitutional claim because "in immigration proceedings, a petitioner has no liberty or property interest in obtaining purely discretionary relief . . . and the denial of such relief therefore cannot implicate due process." *Id.* (internal citations omitted). *See Nativi-Gomez v. Ashcroft*, 344 F.3d 805, 808 (8th Cir. 2003) (applying same rationale to ineffective assistance of counsel claim). In the absence of a viable due process challenge to the BIA's discretionary denial of his application for cancellation of removal, the petitioner did not present a substantial constitutional claim and the court lacked jurisdiction to review his petitions. *Id.*

In this case, Genov similarly challenges, on due process grounds, the BIA's discretionary decisions to deny his motion to reopen and to execute his deportation order. This is not the sort of substantial constitutional issue that justifies the "exceptional procedure" of "safety-valve jurisdiction." *Navarro-Macias v. I.N.S.*, 16 Fed.Appx. 468, 2001 WL 690504, at *2 (7th Cir. 2001). Even if it were, moreover, "the avenue of judicial review in such cases leads directly to the Court of Appeals." *Afsharzadehyadzi v. Perryman*, 214 F. Supp. 2d 884, 888-89 (N.D. Ill. 2002). *See also Morales-Ramirez v. Reno*, 209 F.3d 977, 980 (7th Cir. 2000) (quoting *LaGuerre v. Reno*, 164 F.3d 1035, 1040 (7th Cir. 1998)) ("when a deportee raises constitutional claims 'the deportee can seek review of constitutional issues in the court of appeals directly'"). Thus, this court does not have jurisdiction over Genov's ineffective assistance of counsel claim. *See Pop*, 279 F.3d at 460, (right to effective assistance of counsel in immigration proceedings is "virtually foreclosed"); *Stroe v. I.N.S.*, 256 F.3d 498, 501 (7th Cir. 2001) (implying that an alien has no right to effective counsel unless the INS acts as a "prosecutor").

## III. Authority of the Secretary of Homeland Security

Having determined that there is no jurisdictional bar to addressing Genov's challenge to the authority of the Secretary of Homeland Security to enforce deportation orders, the court next

12

considers the merits of that argument.

### A. The Homeland Security Act

On November 25, 2002, President George W. Bush signed into law the Homeland Security Act of 2002 ("HSA"), Pub. L. 107-296, which created the new Department of Homeland Security effective January 24, 2003. Section 451 of the HSA established the Bureau of Citizenship and Immigration Services, which assumed responsibility for adjudicating petitions, applications, and "[a]ll other adjudications performed by the [INS]." 6 U.S.C. § 271. Section 401 of the HSA created the Directorate of Border and Transportation Security ("BTS") headed by an Under Secretary for Border and Transportation Security. The Under Secretary is responsible for, among other things, (1) "[c]arrying out the immigration enforcement functions vested by statute in, or performed by, the Commissioner of Immigration and Naturalization"; (2) "[e]stablishing and administering rules . . . governing the granting of visas or other forms of permission . . . to enter the United States to individuals who are not a citizen or an alien lawfully admitted for permanent residence in the United States"; and (3) "[e]stablishing national immigration enforcement policies and priorities." 6 U.S.C. § 201. Section 441 of the HSA transferred the following functions from the Commissioner of Immigration and Naturalization to the Under Secretary for Border and Transportation Security: (1) the Border Patrol program; (2) the detention and removal program; (3) the intelligence program; (4) the investigations program; and (5) the inspections program. 6 U.S.C. § 251. See Armentero v. I.N.S., 340 F.3d 1058, 1072 (9th Cir. 2003) (the HSA "abolishes the INS and transfers its enforcement responsibilities to the Directorate of Border and Transportation Security ("BTS"), a division of the [DHS]").

Section 1512 of the HSA addresses the effect of the Act on various agency actions. 6 U.S.C. § 552. Completed administrative actions of an agency are not affected by the HSA or by "the transfer of such agency to the [DHS], but shall continue in effect according to their terms until

13

amended, modified, superceded, terminated, set aside, or revoked in accordance with law by an officer of the United States or a court of competent jurisdiction, or by operation of law." 6 U.S.C. § 552(a)(1). A "completed administrative action" includes orders, determinations, rules, regulations, personnel actions, permits, agreements, grants, contracts, certificates, licenses, registrations, and privileges. 6 U.S.C. § 552(a)(2). Like completed administrative actions, pending administrative actions of an agency "shall continue notwithstanding the enactment of this Act or the transfer of the agency to the [DHS], unless discontinued or modified under the same terms and conditions and to the same extent that such discontinuance could have occurred if such enactment or transfer had not occurred." 6 U.S.C. § 552(b)(1). In addition, "orders issued in such proceedings, and appeals therefrom, and payments made pursuant to such orders, shall issue in the same manner and on the same terms as if this Act had not been enacted or the agency had not been transferred, and any such orders shall continue in effect until amended, modified, superseded, terminated, set aside, or revoked by an officer of the United States or a court of competent jurisdiction, or by operation of law." 6 U.S.C. § 552(b)(2).

### B. Transfer of Functions Versus Authority

Genov argues that the HSA has divested the Attorney General of authority to enforce and administer the Immigration and Nationality Act. At the same time, Genov says, "[t]here is no specific authority granted in the [HSA] that permits the Secretary [of Homeland Security] to assume adjudicatory functions that involve the exercise of discretion." (Supp., at 18.) According to Genov, Congress failed to enact conforming amendments to the INA or the IIRIRA authorizing the Secretary of Homeland Security to "adjudicate cases, grant or deny requests for administrative stays of deportation or otherwise exercise discretionary decisions with respect to the status or presence of aliens in the United States." (*Id.*; Petition, at 8-9; Response, at 10-11.) Genov

14

acknowledges that the HSA transferred the Attorney General's "functions" to the DHS, but claims that the Act failed to similarly transfer the Attorney General's "authority":

> If the delegation of "functions" to the Secretary of Homeland Security, does not include the delegation of "discretionary functions" then the actions of Respondent Ridge and his delegates in deciding when and how to enforce the deportation order entered in this case are non-existent.

(Response, at 11, 18.)

In support of this argument, Genov notes that the only provision of the INA that specifically mentions both the Attorney General and the Secretary of Homeland Security is 8 U.S.C. § 1103, entitled "Powers and duties of the Secretary, the Under Secretary, and the Attorney General." Section 1103(a) provides:

> The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: *Provided, however,* That determination and ruling by the Attorney General with respect to all questions of law shall be controlling.

8 U.S.C. § 1103(a)(1). In Genov's view, this provision is vague and confusing: "If the Attorney General has the ultimate say in all matters of law, the Secretary's function to adjudicate applications and to interpret provisions of the Immigration Act in the adjudicatory process is completely impaired." (Response, at 15.) Genov describes § 1103(a)(1) as a "careless statutory scheme" which did not "vest in the [DHS] the same broad discretionary duties as those contained in the unamended provisions of the Immigration Act." (*Id.*, at 14.) As a result, Genov says, the "Interim District Director's [Cynthia O'Connell's] denial of Petitioner's request for a stay was ultra vires and void as a matter of law." (Supp., at 22-23.) The court disagrees.

Under the HSA, the Directorate of Border and Transportation Security, a division of the DHS, is explicitly vested with responsibility for "[c]arrying out the immigration enforcement functions vested by statute in, or performed by, the Commissioner of Immigration and Naturalization (or any

15

officer, employee, or component of the Immigration and Naturalization Service." *Armentero*, 340 F.3d at 1072 (quoting 6 U.S.C. § 202(3); HSA § 402(3)). This includes administering and enforcing the INS's detention and removal program. *Id.* (citing 6 U.S.C. § 251(2); HSA § 441(2)). *See also* 8 C.F.R. § 2.1 ("[a]ll authorities and functions of the [DHS] to administer and enforce the immigration laws are vested in the Secretary of Homeland Security" who may "delegate any such authority or function" to any subordinate).

Sections 1512(d) and 1517 of the HSA memorialize the statutory delegation to the Secretary of Homeland Security of authority relating to immigration. Section 1512(d) states:

> References relating to an agency that is transferred to the [DHS] in statutes, Executive orders, rules, regulations, directives, or delegations of authority that precede such transfer or the effective date of this Act shall be deemed to refer, as appropriate, to the [DHS], to its officers, employees, or agents, or to its corresponding organizational units or functions. Statutory reporting requirements that applied in relation to such an agency immediately before the effective date of this Act shall continue to apply following such transfer if they refer to the agency by name.

6 U.S.C. § 552(d). Section 1517 further provides:

> With respect to any function transferred by or under this Act (including under a reorganization plan that becomes effective under section 1502) and exercised on or after the effective date of this Act, reference in any other Federal law to any department, commission, or agency or any officer or office the functions of which are so transferred shall be deemed to refer to the Secretary, other official, or component of the [DHS] to which such function is so transferred.

6 U.S.C. § 557. The Secretary of Homeland Security may redelegate any function to any subordinate, absent a contrary provision of law. 6 U.S.C. § 112(b) (unless otherwise provided in the Act, the Secretary "may delegate any of the Secretary's functions to any officer, employee, or organizational unit of the [DHS]"); 6 U.S.C. § 455(c) ("[u]nless otherwise provided in a delegation or by law, any function delegated under this Act may be redelegated to any subordinate").

In this court's view, these provisions suffice to transfer to the DHS both discretionary and non-discretionary functions previously performed by the INS. Contrary to Genov's suggestion, the mere fact that Congress used the term "functions" as opposed to "discretionary functions" in no way

16

demonstrates that the Secretary of Homeland Security and his designees lack authority to make discretionary decisions involving orders of removal. To the extent the former INS had authority to perform such discretionary functions, they are now properly within the province of the DHS. Thus, the court denies Genov's request for an order declaring that the denial of a stay of deportation was null and void.

## IV.     Ineffective Assistance of Counsel

As explained earlier, this court lacks jurisdiction over Genov's ineffective assistance of counsel claim. The court notes, however, that this claim would fail in any event. As a preliminary matter, Genov's claimed constitutional right to effective assistance of counsel in immigration proceedings is "virtually foreclosed" in this circuit. *Pop*, 279 F.3d at 460. In addition, Genov's January 28, 2003 motion to reopen, in which he raised the ineffective assistance of counsel claim, did not comply with the threshold procedural requirements set forth in *Matter of Lozada*, 19 I & N 637 (BIA), *aff'd*, 857 F.2d 10 (1st Cir. 1988). Specifically, Genov failed to demonstrate that his allegations had been communicated to Mr. Butbul and that Mr. Butbul had been given an opportunity to respond. 19 I & N at 639. (*See* Ex. 1 to Return) (noting that motion to reopen "failed to meet the requirements for making an ineffective assistance of counsel claim" in part because "[b]y not affording former counsel an opportunity to respond, we cannot adequately evaluate the claims made by the respondent, and have no explanation from former counsel"). Thus, the BIA did not err in denying that motion. *See Stroe*, 256 F.3d at 501-02 ("[b]y not giving [the attorney] an opportunity to comment on this claim [of ineffective assistance of counsel], the Stroes denied the Board of Immigration Appeals an opportunity to evaluate the significance of [the attorney's] failure to file a brief").

As for Genov's objection to Attorney Butbul's failure to advise him to marry Rumiana, moreover, the court does not agree that an attorney provides ineffective assistance by failing to tell

17

a client to get married in order to increase his chances of remaining in the country. (Petition, at 10.) See, e.g., Valderrama v. I.N.S., 260 F.3d 1083, (9th Cir. 2001) (pursuant to § 5 of the Immigration Marriage Fraud Amendments of 1986, Pub. L. 99-639, 100 Stat. 3537, and the Immigration Act of 1990, Pub. L. 101-640, 104 Stat. 4978, "a marriage entered into by an alien during deportation proceedings is presumptively fraudulent"). Even if such advice were proper, Genov has not demonstrated that he was prejudiced by Mr. Butbul's failure to provide it. *Matter of Lozada*, 19 I & N at 638; *Pop*, 279 F.3d at 460 (citing *Mojsilovic v. I.N.S.*, 156 F.3d 743, 749 (7th Cir. 1998)) (requiring showing of actual prejudice from the ineffective assistance). Genov and Rumiana both testified to other reasons for their decision not to get married; namely, Rumiana's difficulties getting pregnant, and their desire to avoid any appearance of impropriety in Genov's seeking permanent residence in the United States. (Ex. E to Petition, at 63-64; Ex. F to Petition, at 22-24.) Indeed, in denying Genov's January 28, 2003 motion to reopen, the BIA noted that testimony from Genov and Rumiana contradicted Genov's claim that the two chose not to marry based on advice from Mr. Butbul. (Ex. 1 to Return.) Based on this testimony, Genov cannot argue any prejudice from Mr. Butbul's failure to present further evidence regarding Rumiana's health and her relationship with her ex-husband, none of which is probative in the absence of a legal relationship with Genov. (*See* Ex. G to Petition, at 9.)

## V. Mandamus for Expedited Ruling

The final issue before this court is Genov's request for a mandamus ordering the BIA to "expeditiously decide his motion to reopen." (Petition, at 16.) On May 16, 2003, the BIA issued its decision denying that motion. (Ex. 1 to Return.) Accordingly, Genov's request for a mandamus is moot. *See Iddir v. I.N.S.*, 166 F. Supp. 2d 1250, 1258-59 (N.D. Ill. 2001) (quoting *Stotts v. Community Unit Sch. Dist. No. 1*, 230 F.3d 989, 991 (7th Cir. 2000)) (a case is moot and must be

"dismissed as non-justiciable" when "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome").

## CONCLUSION

For the reasons stated above, Genov's Amended Petition for Issuance of Writ of Habeas Corpus and for Mandamus, Declaratory and Injunctive Relief is denied.

ENTER:

Dated: May 12, 2004

REBECCA R. PALLMEYER
United States District Judge